**GLOBAL NAPS, INC., Plaintiff,**

v.

**VERIZON NEW ENGLAND INC., et al., Defendants.**

**No. 02–11501–MLW.**

United States District Court, D. Massachusetts.

Aug. 26, 2004.

---

Cameron F. Kerry, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Jeffrey C. Melick, Global NAPS, Inc, Norwood, MA, for Global NAPs, Inc., Plaintiff.

Bruce P. Beausejour, Keefe B. Clemons, Verizon Communications, Boston, Scott H. Angstreich, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, Susan Paulson, Attorney General's Office, Boston, MA, for Verizon New England, Inc., Massachusetts Department of Telecommunications and Energy, Paul B. Vasington, In his capacity as Commissioner, James Connelly, In his capacity as Commissioner, W. Robert Keating, In his capacity as Commissioner, Deirdre K. Manning, In her capacity as Commissioner, Eugene J. Sullivan, In his capacity as Commissioner, Defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. INTRODUCTION AND SUMMARY

Global NAPs, Inc. has sued Verizon New England Inc. ("Verizon"), the Massachusetts Department of Telecommunications and Energy (the "DTE" or the "Department") and the Commissioners of the Department in an attempt to overturn an Order of the DTE interpreting and approving an interconnection agreement ("ICA") between Global NAPs and Verizon because the DTE has construed that agreement as not requiring Verizon to make certain payments to Global NAPs. After filing suit to seek reversal of the original decision of the DTE, Global NAPs petitioned the DTE for reconsideration. When the DTE denied that request, Global NAPs filed a second suit seeking reversal of the denial of its petition for reconsideration. The court allowed the joint motion of all parties to consolidate the two cases.

The parties have filed cross-motions for summary judgment. On March 9, 2004, the court heard oral argument on those motions. For the reasons described in this Memorandum: there are no material facts in dispute; Global NAPs' Motion for Summary Judgment in being allowed in part; Verizon and the DTE's Motions for Summary Judgment are being denied; and this case is being remanded to the DTE for further proceedings consistent with this Memorandum.

This case presents complex questions of law arising from a complicated statute, the Telecommunications Act of 1996 (the "Act"). Judges have understandably differed, and undoubtedly will continue to differ, on how the complex and not always clear Act apportions authority among state

regulatory agencies, the Federal Communications Commission (the "FCC"), state courts, and federal courts. In what appears to be an issue of first impression in this circuit if not the nation, the court concludes that, in the facts and circumstances of this case, the Full Faith and Credit Clause of the Constitution mandates that if a first state's regulatory agency acting in a judicial capacity issues a final decision interpreting an interconnection agreement, a second state must give that decision whatever preclusive effect the courts of the first state would give it. Since the DTE did not observe this mandate in the instant case, the court is remanding the case to the DTE so that it can conduct any necessary further proceedings and, in any event, issue a decision consistent with this requirement.

However, as summarized below, while the DTE must accept the interpretation of the Rhode Island Public Utilities Commission (the "RIPUC") on common language in agreements between the parties, the ultimate question of whether Verizon was, during the relevant period, required to pay Global NAPs reciprocal compensation for calls to internet service providers completed by Global NAPs ("ISP Traffic" or "ISP-bound Traffic") subject to the Massachusetts agreement remains open and must be decided by the DTE.

In summary, this Memorandum explains the following. In November 1999, the RIPUC decided a complaint brought by Global NAPs against Verizon. Record ("R.") at 313. The complaint was assigned to docket number 2967. *Id.* Global NAPs complained that Verizon was refusing to pay reciprocal compensation that it owed under Section 5.7.2.3 of their agreement concerning Rhode Island. *Id.* Section 5.7.2.3 provides, in pertinent part, that:

> The Parties . . . disagree as to whether . . . "ISP Traffic" . . . constitutes Local Traffic as defined herein, and the charges to be assessed in connection with such traffic. The issue of whether such traffic constitutes Local Traffic on which reciprocal compensation mus[t] be paid pursuant to the 1996 Act is presently before the FCC in CCB/CPD 97–30 and may be before a court of competent jurisdiction. The Parties agree that the decision of the FCC in that proceeding, or [of] such court, shall determine whether such traffic is Local Traffic (as defined herein) and the charges to be assessed in connection with ISP Traffic. If the FCC or such court determines that ISP Traffic is Local Traffic, as defined herein, or otherwise determines that ISP Traffic is subject to reciprocal compensation, it shall be compensated as Local Traffic under this Agreement unless another compensation scheme is required under such FCC or court determination. *Until resolution of this issue, [Verizon] agrees to pay GNAPS Reciprocal Compensation for ISP traffic.*

R. at 356–57 (emphasis added). Thus, Section 5.7.2.3 provided that until the dispute concerning whether the Act required reciprocal compensation for ISP Traffic (the "issue") was decided by the FCC or a court of competent jurisdiction, Verizon would pay reciprocal compensation to Global NAPs.

Verizon argued that its interim obligation to pay reciprocal compensation was resolved by the FCC when it issued its February 26, 1999 Internet Traffic Order ("ITO"). R. at 313. The RIPUC decided that the ITO did not decide the issue and that the ITO alone did not resolve the parties' dispute. R. at 316. The RIPUC decided that, under the ITO, it had the authority and, implicitly, a duty to resolve disputes concerning reciprocal compensation. *Id.* It further decided that the fact that Global NAPs filed a complaint against

Verizon created a presumption that the issue was not resolved and that Verizon had failed to rebut this presumption by showing that Global NAPs' complaint did not have a good faith basis. R. at 316–17. Accordingly, the RIPUC ordered Verizon to pay Global NAPs reciprocal compensation for ISP Traffic pending the resolution of Docket No. 2967. R. at 317.

In January 2002, the RIPUC decided a second complaint brought by Global NAPs against Verizon in the same docket. R. at 192. Verizon had once again ceased paying reciprocal compensation for ISP Traffic under the parties' agreement. *Id.* Verizon argued that the FCC's Order on Remand from the D.C. Circuit, which was effective June 14, 2001, resolved the issue of whether ISP Traffic was subject to reciprocal compensation under the Act, thus terminating its interim obligation to pay. R. at 193. Global NAPs asserted that the issue was not resolved because the parties had not yet had an opportunity to fully appeal the Order on Remand. *Id.*

The RIPUC decided that the Order on Remand resolved the issue within the meaning of the parties' agreement notwithstanding any appeals that might be taken from it. R. at 199. The RIPUC distinguished its earlier decision that the Internet Traffic Order "was *not* dispositive of the reciprocal compensation issue because: (1) the FCC did not definitively resolve whether ISP-bound traffic was subject to reciprocal compensation, (2) the FCC left jurisdiction with the state commissions to determine whether reciprocal compensation payments were due for ISP-bound traffic, and (3) the FCC had not established a recovery mechanism or interim recovery mechanism for ISP-bound traffic, but rather, had indicated the parties should be bound by their ICAs." R. at 198.

In June 2002, the DTE issued its decision in this case. R. at 353. The parties had asked the DTE to approve their interconnection agreement. R. at 354. That agreement included, verbatim, the language of Section 5.7.2.3 of the Rhode Island agreement. However, Verizon and Global NAPs disputed the impact of Section 5.7.2.3 in Massachusetts. *Compare* R. at 359 *with* R. at 363. Verizon also argued that if Global NAPs' interpretation of the agreement were correct, the DTE should reject the agreement because it is contrary to Massachusetts public policy. R. at 360.

Global NAPs asserted that Verizon was collaterally estopped from relitigating the issues decided by the RIPUC. R. at 363. The DTE rejected this argument. R. at 365–66. Instead, the DTE decided that the issue was "resolved in Massachusetts with the issuance of the FCC's Internet Traffic Order." R. at 368. Based on that interpretation of the effect of the ITO, the DTE approved the agreement.

This court finds that the issue of whether the ITO alone "resolved the issue" within the meaning of the parties' identical agreements was litigated and decided by the RIPUC and cannot be relitigated before the DTE. Because the DTE did not, as required, adopt the RIPUC's interpretation and application of Section 5.7.2.3, this case is being remanded. On remand, the DTE must accept that the ITO alone did not, within the meaning of the parties' Massachusetts agreement, resolve the question of whether Verzion was obligated to pay Global NAPs reciprocal compensation for ISP Traffic because the ITO left open the possibility that state legal or equitable principles might establish a duty to pay.

The DTE must then decide, in the first instance, whether and when the Massachusetts state legal or equitable principles that might serve as the foundation of any

obligation to pay reciprocal compensation were so well-settled that the issue was resolved within the meaning of the parties' agreement through a combination of the ITO and Massachusetts state law. The RIPUC decided that the issue was not resolved because, in 1999, there was a good faith dispute over whether reciprocal compensation might be required under Rhode Island state legal or equitable principles. The RIPUC did not consider, let alone decide, whether the issue was resolved under Massachusetts state legal or equitable principles. Thus, the DTE can and should decide this question *de novo*.

Although it might be argued that the DTE already decided this question, *see* R. at 368–70 & n. 12, this contention is inconsistent with the decision in *Global Naps, Inc. v. New England Telephone & Telegraph Co.*, 226 F.Supp.2d 279, 294–95 (D.Mass.2002) (*"Global NAPs I"*), in which the court stated with reference to several of the decisions cited by the DTE in its decision in this case: "DTE has only looked to federal law as the source of reciprocal compensation; it has not looked to whether the interconnection agreements give rise to reciprocal compensation as a matter of Massachusetts contract law.". The DTE did not decide whether state law might provide a basis for reciprocal compensation for ISP Traffic because it believed that the parties' agreement to be bound by the FCC decision meant that state law, as opposed to federal law, could not provide a basis for an obligation to pay reciprocal compensation. Since the DTE viewed state law as irrelevant, it did not consider whether state law was sufficiently clear to render the issue "resolved" after the ITO was issued in February 1999. Once the DTE applies the RIPUC's interpretation of what the contract means, i.e. that the issue is not resolved if there is the potential that Verizon owes reciprocal compensation for ISP Traffic under state law, the DTE must decide whether this issue was resolved in Massachusetts in all or part of the period from July 24, 2000 to June 14, 2001. Verizon would owe reciprocal compensation for any part of that period in which the issue was unresolved.

In the event that the DTE determines that the parties' agreement requires Verizon to make reciprocal compensation payments for ISP Traffic for any period of time, the DTE may also address Verizon's argument that it should reconsider and now reject the parties' agreement because it is contrary to public policy. *See* R. at 360. This issue has not been addressed by the RIPUC or the DTE.

## II. FACTS AND LEGAL BACKGROUND

This dispute centers around compensation of one telephone company, Global NAPs, by another, Verizon, for Global NAPs' role in completing calls made by Verizon customers to Global NAPs customers. More specifically, the calls at issue are calls placed by Verizon customers to their ISPs, who are customers of Global NAPs.

Many people access the internet through a dial-up service, such as America Online. For purposes of this case, a typical customer has a computer with a modem, a telephone line connected to Verizon's network, and an account with his or her ISP. The customer pays Verizon a monthly fee to use the telephone network and pays the ISP a monthly fee to access the internet. The ISP pays its telephone company a monthly fee for each of its many telephone lines, as well as other services. In order to connect to the internet, the customer uses his or her modem to dial a telephone number provided by the ISP. If the ISP is a Verizon customer, Verizon is able to complete the call. If the ISP is not a

Verizon customer and is instead a Global NAPs customer, then Verizon must transfer the customer's call from its network to Global NAPs' network and Global NAPs completes or, in the vernacular of the industry "terminates," the call to the ISP. Once an ISP receives a call from its customer's modem—regardless of how many networks it must pass through to get from the customer to the ISP—the ISP connects the customer to the internet.

The court has considered the parties dispute in the context of the history of the telecommunications industry and associated regulatory schemes. Magistrate Judge Joyce Alexander recently summarized much of the relevant history in a Report & Recommendation adopted in large part by Judge Reginald Lindsay in another case involving the parties now before the court, *Global NAPs I, supra.*

With the advent of integrated telephone service at the turn of the twentieth century, local telephone companies initially competed for customers in their geographic areas. Those telephone companies refused to cooperate with one another in connecting their respective customers, leading to consumer dissatisfaction and, eventually, the emergence of a particular company to serve the telephonic needs of a community. These "natural monopolies" were supported by the rudimentary physical limitations imposed in providing telephone service via underground cables and telephone poles. With the passage of the Communications Act of 1934, Congress attempted to "harness" those monopolies through some regulation, but largely left oversight of the telephone companies to state commissions.

For most of the last century, the federal and state governments disfavored direct competition amongst the telephone service providers and permitted them to maintain monopolistic fiefdoms over blocs of individual, public and corporate consumers within their defined geographic areas. The [Telecommunications] Act [of 1996] radically altered the protectionist scheme that cloaked the monopolies from the forces of free enterprise.

The regulatory shift embodied in the Act is rooted in the exponential advances in the telecommunications arena. As technology marched through the twentieth century, it brought developments far beyond the imagination of Depression-era legislators. The rise of fiber optics, cellular and mobile telephones, and the Internet fundamentally altered the way in which Congress, policymakers, and the business world viewed the industry. Regulators eventually began to believe that the most efficient manner of reigning the industry and serving the public was one in which the market played a role. Indeed, the philosophy underlying the Act is one of classic American market theory. Congress and the executive branch believe that "vigorous competition [within the telecommunications industry] will serve consumers by providing wider choices, better service, and lower prices." Rather than supporting the monopolies, the Act forbade the states from enforcing laws that impeded competition with them. In the wake of the Act, regional monopolies were subject to the full forces of free enterprise and capitalism—a dramatic watershed in how Congress viewed the telecommunications industries in this country, and how consumers receive telecommunications services.

To insure the injection of competition into the telecommunications industry, the Act facilitates the entry of other telecommunications entities into the market to compete vigorously with the

former monopolies. The Act forces pre-existing regional monopolies, now monikered as "incumbent local exchange carriers" or "ILECs," to enter contractual agreements with younger telecommunications companies that had not been protected pursuant to the prior regulatory rubric. Those entities are typically referred to as "competing local exchange carriers" or "CLECs." By imposing a duty on each telecommunications carrier "to interconnect directly or indirectly" with other telecommunications carriers, the Act gives rise to "interconnection agreements."

Interconnection agreements are expected to define what compensation is due to each carrier for the "transport and termination of telecommunications." The process by which parties enter into interconnection agreements has been described by other courts:

> [Pursuant to] Sections 251 and 252 of the Act, [ILECs] have the duty to negotiate in good faith the terms and conditions of agreements regarding facilities access, interconnection, resale of services, and other arrangements contemplated by the Act. Section 252 provided that parties may enter into agreements either voluntarily or through arbitration with a state public utility commission. If the parties are unable to reach an agreement voluntarily, either party may petition the state public utility commission for arbitration. A final interconnection agreement, whether negotiated or arbitrated, is reviewed by the state commission in order to determine whether it complies with the Act.

Thus, the interconnection agreement represents the parties' negotiated outcome to such subjects as the CLEC's access to the ILEC's infrastructure and the terms of that access, including any fees charged by one to the other.

Reciprocal compensation provisions in interconnection agreements

"Reciprocal compensation is the principle by which interconnected telecommunications companies compensate one another for calls their customers initiate but which must be terminated by the competitor telecommunications company." "If a subscriber of Company A calls a subscriber of Company B, then A must share with B some of the revenues A collects from its subscriber, to compensate B for the use of its facilities." As Judge Coar more fully explicates:

> Section 251(b)(5) of [the Act] provides that all LECs have a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." The corresponding regulations define "reciprocal" compensations as an "arrangement between two carriers ... in which each of the two carriers receives compensation from the other carrier for the transport and termination of each carrier's network facilities of local telecommunications traffic that originates on the network facilities of the other carrier." The reciprocal compensation system functions in the following manner: a local caller pays charges to her LEC which originates the call. In turn, the originating carrier must compensate the terminating LEC for completing the call.
>
> Reciprocal compensation applies only to "local telecommunications traffic." Local telecommunications traffic is defined as traffic that "originates and terminates within a local service area established by the state commission."

The theory of reciprocal compensation is seemingly simple: when telecommuni-

cations traffic originates and terminates within a local area, reciprocal compensation is due. The application of the reciprocal compensation rule to the Internet-saturated consumer market, however, raises interesting and complex issues that quickly belie any sense of legal, technological, or economic simplicity:

> If the computer user [consumer] uses one local telephone carrier and the ISP uses a different local telephone carrier, then one must determine if the call is subject to reciprocal compensation. If the call is considered from the computer user to the ISP (i.e., originating and terminating in the local area), then the call would be local and could be subject to reciprocal compensation. If the call is considered on an end to end basis (i.e., an e-mail from the computer user, via the ISP, to a friend across the country) then the call would not terminate in the local area and would not be subject to reciprocal compensation. To further complicate matters, a call could be from a computer user, via the ISP, to a neighbor down the street. This traffic obviously originates and terminates in the local area.

The characterization of ISP-bound traffic determines how much money some carriers receive and how much other carriers pay. Internet calls tend to be longer than average local calls and ISPs do not "call back" at the same volume, if at all. The difference in the calling pattern of regular telephone users and Internet telephone users creates an imbalance that disrupts a basic assumption behind reciprocal compensation: that the carriers' interconnection use will be roughly balanced. In other words, if ISP-bound traffic is local, some incumbent local exchange carriers are forced to compensate competing carriers with ISP clients, without very much likelihood that a similar payment will inure to the incumbent's benefit. "Internet usage has distorted the traditional assumptions [about interconnection] because traffic to an ISP flows exclusively in one direction, creating an opportunity for regulatory arbitrage and leading to uneconomical results."

> Put another way, because ISP-bound calls are "not quite local" and "not quite long-distance," they do not fit neatly within the reciprocal compensation paradigm. Not surprisingly then, CLECs and ILECs tend to see calls to ISPs as fitting the category that best fits their own economic interests.

*Global NAPs I*, 226 F.Supp.2d at 284–87 (citations omitted).

Generally, CLECs tend to have a mixture of customers that is more heavily composed of ISPs than ILECs do. Thus, if calls to ISPs are considered local traffic that is subject to reciprocal compensation, ILECs are likely to have to pay CLECs a large amount of money because the ILEC's customers are making a large number of lengthy calls to the CLEC's ISP customers and there is no comparable volume of calls going in the other direction. If calls to ISPs are not considered local traffic that is subject to reciprocal compensation, CLECs are likely to have to complete a large number of lengthy calls from the ILEC's customers for which the CLEC will receive no compensation from the person placing the call.

The uncertainty surrounding whether ISP Traffic is subject to reciprocal compensation has spurred a large amount of activity before the FCC, before state regulatory agencies, and before the courts. It has also resulted in some creative drafting of ICAs between ILECs and CLECs.

This case involves the intersection of several regulatory proceedings before the FCC, the DTE, and the RIPUC as well as an interconnection agreement between Global NAPs and Verizon.

## A. THE RHODE ISLAND AGREEMENT

Global NAPs and Verizon first began doing business with each other in Massachusetts in April 1997. R. at 307. The interconnection agreement which first governed the relationship of the two companies was addressed in *Global NAPs I*[1]. This case relates to a different Massachusetts interconnection agreement, entered into on July 24, 2000, which will be described in more detail.

In July 1998, Global NAPs and Verizon negotiated interconnection agreements to govern their relationships in several other states. R. at 307. One of these states was Rhode Island. *Id.* On October 1, 1998, the RIPUC approved the interconnection agreement for Rhode Island (the "Rhode Island Agreement") pursuant to its duties under 47 U.S.C. § 252(e). *Id.* Section 5.7.2.3 of the Rhode Island Agreement reads as follows:

> The Parties stipulate that they disagree as to whether traffic that originates on one Party's network and is transmitted to an Internet Service Provider ("ISP") connected to the other Party's network ("ISP Traffic") constitutes Local Traffic as defined herein, and the charges to be assessed in connection with such traffic. The issue of whether such traffic constitutes Local Traffic on which reciprocal compensation mus[t] be paid pursuant to the 1996 Act is presently before the FCC in CCB/CPD 97–30 and may be before a court of competent jurisdiction. The Parties agree that the decision of

the FCC in that proceeding, or [of] such court, shall determine whether such traffic is Local Traffic (as defined herein) and the charges to be assessed in connection with ISP Traffic. *If the FCC or such court determines that ISP Traffic is Local Traffic, as defined herein, or otherwise determines that ISP Traffic is subject to reciprocal compensation, it shall be compensated as Local Traffic under this Agreement unless another compensation scheme is required under such FCC or court determination. Until resolution of this issue, [Verizon] agrees to pay GNAPS Reciprocal Compensation for ISP traffic* (without conceding that ISP Traffic constitutes Local Traffic or precluding [Verizon]'s ability to seek appropriate court review of this issue) pursuant to the [New York Public Service] Commission's Order in Case 97–C–1275, dated March 19, 1998, as such Order may be modified, changed or reversed.

R. at 356–57 (emphasis added).

At the time the parties first negotiated the Rhode Island Agreement, the New York Public Service Commission had issued an Order declaring that ISP traffic is subject to reciprocal compensation. The FCC had not yet ruled on this issue, but was considering it in a particular proceeding, CCB/CPD 97–30. The Massachusetts DTE had also not yet addressed the issue. However, on October 21, 1998, the DTE ruled that ISP traffic is subject to reciprocal compensation (the "October 1998 Order"). R. at 307.

## B. THE INTERNET TRAFFIC ORDER AND ITS AFTERMATH

By early 1999, the FCC had consolidated Docket No. CCB/CPD 97–30 into a

1. That case related to Global NAPs' attempt to receive reciprocal compensation for calls completed during the time the parties operated under this earlier agreement.

different docket, No. 96–98. On February 26, 1999, the FCC issued an Order in Docket 96–98, ruling that the Act did not require that ISP-bound Traffic be subject to reciprocal compensation. *See* R. at 308, 368. This Order is sometimes referred to as the "Internet Traffic Order" or "ITO". Among other things, the FCC stated in the ITO that:

1. . . . . [W]e conclude that ISP-bound traffic is jurisdictionally mixed and appears to be largely interstate. This conclusion, however, does not in itself determine whether reciprocal compensation is due in any particular instance. As explained below, parties may have agreed to reciprocal compensation for ISP-bound traffic, or a state commission, in the exercise of its authority to arbitrate interconnection disputes under section 252 of the Act, may have imposed reciprocal compensation obligations for this traffic. In the absence, to date, of a federal rule regarding the appropriate inter-carrier compensation for this traffic, we therefore conclude that parties should be bound by their existing interconnection agreements, as interpreted by state commissions.

\* \* \* \* \* \*

21. We find no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic, pending adoption of a rule establishing an appropriate interstate compensation mechanism. We seek comment on such a rule in Section IV, below.

22. Currently, the Commission has no rule governing inter-carrier compensation for ISP-bound traffic. In the absence of such a rule, parties may voluntarily include this traffic within the scope of their interconnection agreements under sections 251 and 252 of the Act, even if these statutory provisions do not apply as a matter of law. Where parties have agreed to include this traffic within their section 251 and 252 interconnection agreements, they are bound by those agreements, as interpreted and enforced by the state commissions.

\* \* \* \* \* \*

27. State commissions considering what effect, if any, this Declaratory Ruling has on their decisions as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic might conclude, depending on the bases of those decisions, that it is not necessary to re-visit those determinations. We recognize that our conclusion that ISP-bound traffic is largely interstate might cause some state commissions to re-examine their conclusion that reciprocal compensation is due to the extent that those conclusions are based on a finding that this traffic terminates at an ISP server, but *nothing in this Declaratory Ruling precludes state commissions from determining, pursuant to contractual principles or other legal or equitable considerations, that reciprocal compensation is an appropriate interim inter-carrier compensation rule pending completion of the rulemaking we initiate below.*

*In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP–Bound Traffic,* 14 FCC Rcd 3689 ¶¶ 1, 21–22, 27 (1999) (emphasis added).

Therefore, although it concluded that the Act did not mandate that ISP Traffic be subject to reciprocal compensation, the FCC acknowledged the possibility that state commissions might still require reciprocal compensation as a matter of state law or policy. Among other things, state commissions could enforce agreements, ei-

ther implicit or explicit, that required companies to provide reciprocal compensation for ISP Traffic. As explained in *Global NAPs I*:

Notably, although the FCC concluded for purposes of its own rules and regulations on reciprocal compensation that "calls to ISPs constitute jurisdictionally mixed, largely interstate traffic," the FCC's decision lacked comprehensive definitiveness by propagating a "hands-off" approach toward state commissions and by refusing to interfere in their decisions on whether reciprocal compensation provisions should be applied to interconnection agreements. Thus, the [Internet Traffic Order] expressly permitted state commissions to continue to decide whether reciprocal compensation was due to a carrier for ISP-bound traffic, particularly in cases where there was explicit or implicit provision to that effect in any interconnection agreement previously entered by the parties.

*Global NAPs I*, 226 F.Supp.2d at 288 (citations omitted).

In the wake of the Internet Traffic Order, Verizon stopped paying reciprocal compensation to Global NAPs under the Rhode Island Agreement. Global NAPs filed a complaint with the RIPUC, arguing that "the Internet Traffic Order expressly left to state commissions the authority to determine whether reciprocal compensation was due under an interconnection agreement." Global NAPs' Br. at 3. The complaint was assigned to docket number 2967. R. at 313. The parties submitted papers to the RIPUC and agreed that no hearing was necessary. R. at 314.

On November 16, 1999, the RIPUC issued its decision. The RIPUC "agree[d] with Global NAPs that the issue of whether ISP Traffic constitutes 'local traffic' for which reciprocal compensation must be paid under the [Rhode Island Agreement] was not resolved by the FCC's ITO" and ordered Verizon to pay reciprocal compensation pending the outcome of Docket Number 2967. R. at 313–18. The RIPUC reasoned that the FCC had not resolved the issue within the meaning of the agreement because the FCC left open the possibility that a state commission could require reciprocal compensation and that the RIPUC had the authority to resolve those disputes in Rhode Island. R. at 316. The RIPUC further concluded that there was a presumption that if Global NAPs filed a good-faith complaint against Verizon seeking reciprocal compensation for ISP Traffic, then the issue of whether reciprocal compensation was due was not resolved. R. at 316–17. Verizon did not rebut this presumption. R. at 317.

At the request of Verizon, the DTE reevaluated its October 1998 Order declaring ISP Traffic subject to reciprocal compensation in light of the Internet Traffic Order. R. at 241–42. In May 1999, while not interpreting the contract provision at issue here, the DTE held that, as of February 26, 1999, the date of the Internet Traffic Order, companies in Massachusetts were no longer required to pay reciprocal compensation for ISP-bound traffic. R. at 242 (citing the DTE's "May 1999 Order"). The Department described the Internet Traffic Order as "liberating" in that it "gives us the discretion to do what we would have liked to have been able to do back in October-namely, to get the parties to the interconnection agreement to set rationally based, economic bounds on reciprocal compensation payments for ISP-bound traffic." R. at 243. The Department believed that treating ISP Traffic as Local Traffic created an opportunity for regulatory arbitrage of which CLECs were taking advantage to the detriment of ILECs and the marketplace as a whole. However, before the FCC issued the In-

ternet Traffic Order, the Department felt bound by FCC precedent to treat ISP Traffic as local traffic subject to reciprocal compensation. It is this May 1999 Order, among others, that was found to be infirm in *Global NAPs I*, 226 F.Supp.2d at 280.

In any event, the DTE's May 1999 Order did not address the implications of the Internet Traffic Order for Section 5.7.2.3. The November 16, 1999 RIPUC decision was the first decision to do so.

## C. THE MERGER

While the various battles over reciprocal compensation were being fought, Verizon's predecessor companies were pursuing the merger that would result in the new company called Verizon. On October 2, 1998—the day after the RIPUC approved the Rhode Island Agreement—Bell Atlantic and GTE filed an application with the FCC for approval of a proposed merger to become Verizon [2]. R. at 309. This application was later supplemented by a set of voluntary conditions for approval and, on June 16, 2000, the FCC approved the merger in what the parties refer to as the "Merger Order." The Merger Order incorporated the voluntary conditions submitted by Verizon.

One such provision, Paragraph 32, reads, in pertinent part:

32. *In–Region Pre–Merger Agreements:* Subject to the Conditions specified in this Paragraph, [Verizon] shall make available: (1) in the Bell Atlantic Service Area to any requesting telecommunications carrier any interconnection arrangement, UNE, or provisions of an interconnection agreement (including an entire agreement) subject to 47 U.S.C. § 251(c) and Paragraph 39 of these Con-

ditions that was voluntarily negotiated by a Bell Atlantic incumbent LEC with a telecommunications carrier, pursuant to 47 U.S.C. § 252(a)(1), prior to the Merger Closing Date .... [Verizon] shall not be obligated to provide pursuant to this Paragraph any interconnection arrangement or UNE unless it is feasible to provide given the technical, network and OSS attributes and limitations in, and is consistent with the laws and regulatory requirements of, the state for the request is made.

Thus, as a condition of the merger, CLECs were given the right to "opt in" to any interconnection agreement Verizon had negotiated, subject to certain restrictions.

## D. THE D.C. CIRCUIT VACATES THE INTERNET TRAFFIC ORDER

Neither CLECs nor ILECs were completely satisfied with the Internet Traffic Order and both camps filed appeals. On March 24, 2000, the Court of Appeals for the D.C. Circuit vacated the Internet Traffic Order for want of reasoned decision-making and remanded the case to the FCC. *See Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C.Cir.2000).

Based on the D.C. Circuit's decision, Global NAPs returned to the DTE and asked it to reconsider its May 1999 Order and reinstate the scheme of reciprocal compensation under the October 1998 Order. On July 11, 2000, the DTE refused, "essentially stating that the ongoing evolution of controlling law was too nebulous a body upon which to make decisions, and that the most 'prudent course' was to await further FCC rulings." *Global NAPs I*, 226 F.Supp.2d at 291.

**2.** The Rhode Island Agreement was actually an agreement between Global NAPs and New England Telephone and Telegraph Company, which was doing business in various states as

Bell Atlantic—Massachusetts, Bell Atlantic—Rhode Island, etc. The court is referring to all Bell Atlantic entities as "Verizon" for the sake of simplicity.

It took the FCC several months to respond to the D.C. Circuit's decision. On April 27, 2001, the FCC issued its Order on Remand. The Order on Remand treats ISP-bound traffic as interstate traffic subject to FCC regulation and not subject to reciprocal compensation. The FCC also delineated a compensation scheme to govern compensation for ISP-bound traffic from June 14, 2001 forward. This compensation scheme included an interim measure to reduce any shock to the market resulting from the shift from reciprocal compensation regimes to the FCC's new compensation scheme, which does not provide for reciprocal compensation and instead arranges for LECs to "bill [their subscribers for ISP-bound Traffic] and keep [those revenues]."

The Order on Remand was appealed and, on May 3, 2002, the D.C. Circuit "remanded, but did not vacate, the FCC's Order on Remand for further consideration by the FCC." Verizon's Br. at 8 (citing *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C.Cir.2002), *cert. denied*, 538 U.S. 1012, 123 S.Ct. 1927, 155 L.Ed.2d 848 (2003)). The FCC has confirmed that, since the D.C. Circuit remanded but did not vacate the Order on Remand, the Order on Remand remains in effect. *Id.*

After the Order on Remand, Verizon once again ceased paying reciprocal compensation for ISP Traffic in Rhode Island. R. at 192–93. Verizon took the position that the FCC's Order on Remand resolved the issue of whether ISP Traffic was subject to reciprocal compensation under the Act, thus terminating its interim obligation to pay. R. at 193. Global NAPs took the position that the issue was not resolved because the parties had not yet had an opportunity to fully appeal the Order on Remand. *Id.*

On January 29, 2002, the RIPUC decided that the Order on Remand resolved the question of whether ISP traffic is subject to reciprocal compensation, thus terminating Verizon's obligation to pay under Section 5.7.2.3. R. at 199. The RIPUC distinguished its earlier decision that the Internet Traffic Order "was *not* dispositive of the reciprocal compensation issue because: (1) the FCC did not definitively resolve whether ISP-bound traffic was subject to reciprocal compensation, (2) the FCC left jurisdiction with the state commissions to determine whether reciprocal compensation payments were due for ISP-bound traffic, and (3) the FCC had not established a recovery mechanism or interim recovery mechanism for ISP-bound traffic, but rather, had indicated the parties should be bound by their ICAs." R. at 198 (emphasis in original). The RIPUC rejected Global NAPs' argument that the issue was not resolved because the parties had not yet had an opportunity to appeal the Order on Remand. *Id.*

## E. ADOPTION OF THE RHODE ISLAND AGREEMENT IN MASSACHUSETTS

The original interconnection agreement for Massachusetts between Global NAPs and Verizon expired on May 8, 2000.

Shortly after the DTE denied Global NAPs' request to return to a scheme of reciprocal compensation in Massachusetts and shortly before the FCC approved the merger, on July 24, 2000, Global NAPs notified Verizon that it wished to adopt the Rhode Island Agreement in Massachusetts. R. at 10. Global NAPs' position was that, under Paragraph 32 of the Merger Order, it was entitled to adopt the entire Rhode Island Agreement in Massachusetts, subject to the approval of the DTE. Verizon initially agreed that, generally, Global NAPs was entitled to adopt the Rhode Island Agreement in Massachusetts, effective July 24, 2000, but disputed

whether Section 5.7.2.3 could be adopted. The parties negotiated for about nine months. After they failed to reach an agreement, Global NAPs filed a complaint against Verizon with the FCC, asking the FCC to enforce the Merger Order by instructing Verizon to permit it to adopt the Rhode Island Agreement in its entirety and, in addition, award Global NAPs damages in excess of $26 million for ISP-bound traffic that it had terminated for Verizon customers in Massachusetts and Virginia during the nine month negotiation.

The FCC agreed with Global NAPs, holding that Paragraph 32 of the Merger Order requires Verizon to permit Global NAPs to enter into the entire Rhode Island Agreement in Massachusetts. However, the FCC:

> note[d] that paragraph 32 specifically states that interconnection terms adopted across state lines must be "consistent with the laws and regulatory requirements of the state for which the request is made." Thus, [the FCC] conclude[s] that although the [FCC] may determine whether an agreement is eligible for adoption pursuant to paragraph 32, only the relevant state commission may ultimately decide whether particular terms of the agreement should be adopted in that state, and if so, what those terms mean.

R. at 14.

With respect to Global NAPs' request for damages, the FCC ruled that the request was premature because "[o]nly if and when the state commissions approve the interconnection agreements, pursuant to section 252(e)(2) of the Act, will the issue of Global NAPs' entitlement to damages under those agreements be ripe for the appropriate regulatory agency to adjudicate." R. at 15.

## F. THE DTE'S ORDER

In March 2002, about a month after the FCC ruled that Verizon must offer Global NAPs the entire Rhode Island Agreement in Massachusetts, Verizon submitted the Rhode Island Agreement to the DTE for approval pursuant to 47 U.S.C. § 252(e). However, Verizon asked the DTE to rule, as part of its approval of the Rhode Island Agreement, that it was not liable to Global NAPs for reciprocal compensation under Section 5.7.2.3 for ISP-bound traffic in Massachusetts.

The parties agree that their obligations after June 14, 2001 are governed by the FCC's Order on Remand. Their dispute is over their obligations for the effective period of the Rhode Island Agreement in Massachusetts before that date. This period begins on July 24, 2000, the day Global NAPs notified Verizon it intended to opt in to the Rhode Island Agreement in Massachusetts.

### 1. *The Parties' Contentions*

Essentially, Verizon argued that the DTE recognized in its May 1999 Order that the FCC had determined, in its Internet Traffic Order, that ISP Traffic was not subject to reciprocal compensation under the Act, and, therefore, the FCC had made the determination required by Section 5.7.2.3 and Verizon's obligation to provide reciprocal compensation pending the issue's resolution was complete as of February 26, 1999. R. at 359.

Global NAPs argued that the Department should approve the agreement because it is analogous to other negotiated agreements between Verizon and CLECs approved by the DTE that provide for compensation for ISP Traffic. R. at 361–62. According to Global NAPs, despite the Department's general opposition to reciprocal compensation for ISP Traffic expressed in its May 1999 Order, the De-

partment has always approved agreements negotiated between Verizon and CLECs even if they provide for reciprocal compensation for ISP Traffic. R. at 362.

Furthermore, Global NAPs argued that since the RIPUC already decided this issue in a proceeding involving the same two parties, Verizon was estopped from relitigating the question of whether the Internet Traffic Order relieved it from its obligations under Section 5.7.2.3. R. at 363. A contrary decision, according to Global NAPS, would violate the Full Faith and Credit Clause of the Constitution and defeat the purpose of the Merger Order by permitting Verizon to escape contract terms in Massachusetts that it was obligated to offer under the conditions of the Merger Order. *Id.*

Even if Verizon were permitted to relitigate the issue, Global NAPs argued that since the Internet Traffic Order had been vacated by the time the parties agreed to adopt the Rhode Island Agreement in Massachusetts, neither the FCC nor a court had resolved the issue. *Id.* Finally, Global NAPs suggested that the Department need not even resolve the issue at this point, but should instead approve the agreement and then let the parties resolve the dispute over its implications. R. at 363–64.

Verizon responded that, for purposes of a Massachusetts agreement, the FCC had decided that this issue was not controlled by the RIPUC's decision. Verizon argued that, in ruling on the dispute regarding whether Paragraph 32 of the Merger Order mandated that Verizon offer Global NAPs the entire Rhode Island Agreement in other states, the FCC "made clear ... that the Rhode Island Agreement would be subject to a *de novo* review by the Department." R. at 360. Verizon attempted to distinguish ICAs between Verizon and other CLECs that set special re-

ciprocal compensation rates for ISP Traffic from the Rhode Island Agreement because the other ICAs were negotiated after the DTE's May 1999 Order declaring ISP Traffic was not local traffic and treated ISP Traffic as a special category of traffic rather than as local traffic. *Id.*

Verizon also argued that "if the Department were to determine that Section 5.7.2.3 would otherwise entitle Global NAPs to receive reciprocal compensation for ISP-bound traffic after May 19, 1999 [the date when the DTE issued its Order determining that ISP-bound traffic was not subject to reciprocal compensation], the Department should deny the approval of the Rhode Island Agreement if it includes Section 5.7.2.3, because such compensation would be unreasonable, uneconomic, and contrary to public policy and the public interest." *Id.*

Global NAPs responded that the agreement meets the standard for approval under the Act even with Section 5.7.2.3 and other states have approved identical provisions. R. at 361.

## 2. *The DTE's Decision*

On June 24, 2002, the DTE agreed with Verizon and approved the Rhode Island Agreement with the understanding that Section 5.7.2.3 did not require Verizon to pay reciprocal compensation for ISP Traffic during the time period the Agreement was effective. R. at 371. One Commissioner dissented. R. at 374.

The DTE's decision recites the arguments of the parties and sets forth the standard it must apply under the Act. The DTE "may only reject negotiated portions of an agreement if it finds that: (1) the agreement discriminates against a telecommunications carrier not a party to the agreement, or (2) the implementation of such agreement is not consistent with the

public interest, convenience, and necessity." R. at 364 (citing 47 U.S.C. § 252(e)(2)(A)).

As an initial matter, the DTE rejected Global NAPs' suggestion that it approve the agreement first and only later decide what Section 5.7.2.3 means. R. at 364–65. The DTE found that it had a responsibility to determine what the Section means so that it could properly determine if the Rhode Island Agreement should be approved. R. at 365.

The DTE also rejected Global NAPs' arguments relying on collateral estoppel and the Full Faith and Credit Clause. The Department reasoned:

Paragraph 32 of Appendix D of the [ ] Merger Order, pursuant to which Global NAPs seeks to adopt the Rhode Island Agreement in Massachusetts, states that "[Verizon] shall not be obligated to provide pursuant to this Paragraph any interconnection arrangement ... unless it is ... consistent with the laws and regulatory requirements of [ ] the state for which the request is made ...." In addition, 47 U.S.C. § 252(e)(3) states, "[S]ubject to section 253, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement ...." While the RI PUC's interpretation of Verizon's obligations under Section 5.7.2.3 may be useful, it is not dispositive here. We do not read the [ ] Merger Order as requiring our binding adoption of another PUC's view of its own state's law concerning a negotiated agreement. That reservation is particular strong where, as here, the adopting state has fully litigated the contested issue. Therefore, we must conduct a review of Section 5.7.2.3 of the Rhode Island Agreement by looking at the situation in Massachusetts, not Rhode Island; and our review is controlled by the prior decisions rendered by the Department (and, ultimately, the courts that review these decisions), not, with all respect to a sister agency, the RI PUC.

R. at 365–66.

The DTE then turned to the text of the agreement. The DTE describes the agreement as (1) acknowledging a dispute over whether ISP-bound Traffic constitutes local traffic; (2) agreeing that the decision of the FCC in CCB/CPD 97–30 or a court of competent jurisdiction would resolve this issue; and (3) placing an obligation on Verizon to pay reciprocal compensation until the issue was resolved. R. at 367–68. The Department described its "precedent [as] stat[ing] that the issue of whether ISP-bound traffic is local traffic and, thus, subject to payment of reciprocal compensation, was resolved in Massachusetts with the issuance of the FCC's Internet Traffic Order in February 1999." R. at 368. Thus, the Department concluded "[b]y seeking to implement an interconnection agreement in Massachusetts, Verizon and Global NAPs are bound by our interpretation and application of the Internet Traffic Order in Massachusetts." R. at 369. The DTE rejected Global NAPs' argument that the status of ISP-bound traffic was, at any time, indeterminable in Massachusetts. *Id.*

Having construed Section 5.7.2.3 to mean that Verizon did not have to pay reciprocal compensation, the DTE did not need to address Verizon's arguments that it should not approve the Rhode Island Agreement because Section 5.7.2.3, as Global NAPs reads it, is contrary to Massachusetts public policy.

## G. THE APPEAL AND REQUEST FOR RECONSIDERATION

Global NAPs filed this case on July 24, 2002 seeking review of the DTE's Order

under the 1996 Act. *See* 47 U.S.C. § 252(e)(6).

On August 27, 2002, Judge Lindsay adopted in large part[3] Magistrate Judge Alexander's Report and Recommendation in *Global NAPs I*. This decision effectively overturned the DTE's May 1999 Order as the court concluded that it was issued contrary to federal law and remanded the case to the DTE. Magistrate Judge Alexander wrote:

> The plain language of the FCC's rulings expressly stated that the rulings were not intended to be used as a foundation for overturning prior decisions by state regulatory commissions. *See, e.g.,* 14 FCCR. at 3689, ¶¶ 20–24, 27, 16 FCCR. at 9189, ¶ 82. Given that the [Internet Traffic Order] directly contravened the analysis relied upon by the DTE in deciding that reciprocal compensation was due to MCI in the 1999 DTE Order, the DTE may have acted properly in reconsidering in light of the FCC's ruling. But the propriety of that reconsideration does not equate with the notion that the [Internet Traffic] Order compelled a vacatur of the [October] 1998 DTE Order, nor does it excuse the DTE from declining to consider whether the express contractual language in the interconnection agreements gives rise to reciprocal compensation. Indeed, one consistency in all of the FCC's varied permutations on this issue has been the suggestion that states' commissions are to consider that basis in formulating their orders. *Id.* Such a result is consistent with the cooperative federalism that underlies the Act, and the critical role that the states' commissions are to play in effectuating the Act. Indeed, in that the Act is premised on the belief that free market competition rather than sov-

ereign oversight is the better method of telecommunications regulation, it would be antithetical to the Act to simply ignore the fact that there is a contractual agreement between carriers that purportedly governs the issue of reciprocal compensation for calls to ISPs.

> Moreover, in the [Internet Traffic] Order upon which the DTE purportedly relied, the FCC expressly stated that carriers "should be bound by their existing interconnection agreements, *as interpreted by state commissions.*" *Southwestern Bell,* 208 F.3d at 483, citing [Internet Traffic] Order (emphasis furnished). DTE, citing its own 1999 DTE Order, recognizes "the FCC's consoling notion that some states' orders might stand on state 'contractual principles or other legal or equitable' considerations" but avers that its [October] 1998 DTE Order rested entirely on interpretation of federal law and regulatory guidance on whether a call to an ISP warrants reciprocal compensation. *See* DTE's Memorandum of Law in Support of its Cross–Motion for Summary Judgment, at pp. 12–13. That is precisely the point: *DTE has only looked to federal law as the source of reciprocal compensation; it has not looked to whether the interconnection agreements give rise to reciprocal compensation as a matter of Massachusetts contract law.* Thus, although the DTE is not required to reach the same result it reached in the [October] 1998 DTE Order, federal law requires that the DTE consider the contractual language in the parties' interconnection agreements to determine whether the parties contracted for reciprocal compensation.

*Global NAPs I,* 226 F.Supp.2d at 294–95 (emphasis added).

---

**3.** Judge Lindsay did not agree that Global NAPs and other CLECs were entitled to a preliminary injunction against the enforcement of various DTE Orders.

Based on the decision in *Global NAPs I*, Global NAPs petitioned the DTE to reconsider its Order in this case. Supplemental Record ("S.R.") at 25. Verizon responded. S.R. at 16. The DTE denied the petition for reconsideration on February 12, 2003, citing (1) Global NAPs' failure to file the motion within the 20–day limit established by the Code of Massachusetts Regulations and failure to address the issue of good cause for its late filing; and (2) the petition's lack of merit because the decision in *Global NAPs I* dealt with a different set of issues and had no bearing on the "contract analysis" the DTE conducted when it issued the Order in this case. S.R. at 1–13.

## III. ANALYSIS

Global NAPs asserts several claims in its complaint. It claims that: (1) the DTE's decision violates the Full Faith and Credit Clause; (2) the DTE improperly relied on its own policy views rather than interpret the contract according to the intent of the parties; (3) the DTE's conclusion that the vacated Internet Traffic Order "resolved the issue" within the meaning of Section 5.7.2.3 was clearly erroneous; (4) the DTE's conclusion that the vacated Internet Traffic Order "resolved the issue" within the meaning of Section 5.7.2.3 was arbitrary in light of the DTE's acknowledgment that when the Internet Traffic Order was vacated the law was unsettled; and (5) the DTE acted arbitrarily by approving other contracts that provided for some compensation for ISP-bound Traffic but not interpreting this contract to provide for analogous compensation. Global NAPs also argues in its summary judgment papers that Verizon and the DTE are collaterally estopped from claiming that the issue of whether ISP Traffic was local traffic was resolved because of the court's ruling in *Global NAPs I*.

Before addressing the merits of Global NAPs' arguments, the court is presented with threshold questions about what law governs those claims and whether the court has jurisdiction to decide them. At least one of Global NAPs' claims, the Full Faith and Credit Clause claim, clearly arises under federal law. It is less certain whether Global NAPs' claims that the DTE misinterpreted Section 5.7.2.3 arise under federal law or state law. The resolution of this issue has potential implications for the scope of the court's jurisdiction, the appropriate standard of review, and the merits of Global NAPs' Full Faith and Credit Clause claim.

■ The Supreme Court has not addressed "[w]hether the interpretation of a reciprocal-compensation provision in a privately negotiated interconnection agreement presents a federal issue" as opposed to a state law issue. *Verizon Md., Inc. v. Pub. Svc. Comm'n*, 535 U.S. 635, 650 n. 4, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (Souter, J., concurring). The courts and commentators are split on this issue. *See, e.g., Verizon Md. Inc. v. RCN Telecom Svcs., Inc.*, 248 F.Supp.2d. 468, 477–78 (D.Md.2003) (concluding that claim that state commission misinterpreted terms of interconnection agreement arose under state rather than federal law), *rev'd in part, aff'd in part and dismissed in part, Verizon Md., Inc. v. Global NAPs, Inc.*, 377 F.3d 355 (4th Cir.2004) (reversing district court and holding that claims arose under federal law); *id.* at 369–394 (Niemeyer, J., concurring in part and dissenting in part) (agreeing with district court); Peter W. Huber et al., *Federal Telecommunications Law* § 6.3 at 75–76 (2d ed. 2002 Supp.) (criticizing Seventh Circuit decision for adopting "without reflection" incorrect assumption that interpretation of interconnection agreement is a matter of state rather than federal law).

Verizon takes the position that interconnection agreements are "federal regulatory documents" and their interpretation raises a question of federal law. Verizon's Br. at 15. The DTE takes the position that the interpretation of interconnection agreements is "an issue informed by state contract law." DTE's Br. at 3. Global NAPs takes "the position that interpretation of an interconnection agreement is a question of state law." Global NAPs' Reply at 5.

This court finds that the Maryland District Court's decision and Judge Niemeyer's dissent in the Fourth Circuit's decision are persuasive. It concludes that privately negotiated interconnection agreements are state law contracts and a claim that an ICA has been violated or misinterpreted is a claim under state law.

> Interconnection agreements may well be "creations of federal law." *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.,* 372 U.S. 682, 692, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963); *see also* Peter W. Huber et al., Federal Telecommunications Law 76 (2d ed. Supp.2002)(so arguing). Only, however, if Congress *also* intended "that the rights and duties contained in [such] contracts be federal in nature," do post-agreement disputes about the meaning of contractual terms raise federal questions. *Jackson Transit Auth.,* 457 U.S. at 23, 102 S.Ct. 2202, 72 L.Ed.2d 639. In other words, "absent evidence of congressional intent to make contractual rights and duties 'federal in nature,' even causes of action based on an alleged breach of a federally-mandated contract provision present 'only state-law claims.' " *Nieto–Santos v. Fletcher Farms,* 743 F.2d 638, 641 (9th Cir.1984)(quoting *Jackson Transit Auth.,* 457 U.S. at 23, 102 S.Ct. 2202, 72 L.Ed.2d 639).

*Verizon Md.,* 248 F.Supp.2d. at 478; *see also Verizon Md.,* 377 F.3d 355, 369–394 (Niemeyer, J., dissenting); *accord Southwestern Bell Tel. Co. v. Pub. Util. Comm'n,* 208 F.3d 475, 485 (5th Cir.2000) ("[W]e hold that the agreements themselves and state law principles govern the questions of interpretation of the contracts and enforcement of their provisions [and] therefore decline Southwestern Bell's invitation to determine the contractual issues as a facet of federal law."); *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Svcs., Inc.,* 323 F.3d 348, 355–56 (6th Cir.2003) (concluding that interpretation of interconnection agreement involved state law).

The provisions of the Act indicate that there is a strong federal interest in companies reaching some kind of agreement to interconnect their networks. *See* 47 U.S.C. § 251(a)(1) (establishing duty to interconnect); 47 U.S.C. § 252 (defining procedures for reaching agreements regarding interconnection). However, an examination of the Act as a whole indicates that "[e]ven though interconnection agreements and reciprocal-compensation arrangements are important to fulfilling the federal interest in promoting local competition, the content of those arrangements is not." *Verizon Md.,* 377 F.3d at 391 n. 9 (Niemeyer, J., dissenting). In the spirit of deregulation, the Act adopts a federal policy that mandates interconnection, but leaves the content of ICAs to the industry and the states.

In other words, so long as companies interconnect, Congress and the President have taken a hands-off approach to the terms on which the companies interconnect. This policy is evidenced by: § 252(a)(1), which allows companies to negotiate agreements "without regard to the standards set forth in subsections (b) and (c) of section 251 of this title;" § 252(e)(2)(A), which allows each state's utility commission, rather than the FCC,

to determine whether a proposed agreement "is not consistent with the public interest, convenience, and necessity;" § 252(f), which provides for statements of generally available terms on a state-by-state basis rather than a national basis; and § 252(i), which allows for telecommunications carriers to opt-in to approved agreements with other carriers, but only on a state-by-state basis rather than on a national basis. These provisions indicate that ICAs are not like the contracts at issue in *International Assoc. of Machinists v. Central Airlines, Inc.,* 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). In *Central Airlines,* the Supreme Court held that if the contracts at issue were to serve their function under the Railway Labor Act, "their validity, interpretation, and enforceability cannot be left to the laws of the many States." *Id.* at 691, 83 S.Ct. 956. If the federal interest in the content of ICAs—as opposed to the creation of ICAs—were so strong that their validity, interpretation and enforceability could not be left to the laws of the several states, the Act would not have explicitly left the approval of ICAs in the first instance in the hands of state commissions.[4]

Thus, Global NAPs' claims include issues of both federal law and state law.

## A. JURISDICTION

The parties agree that the court has jurisdiction to consider all of Global NAPs' claims. However, Magistrate Judge Alexander and Judge Lindsay in *Global NAPs I* both wrote that "[t]his Court's review of the parties' claims is limited by ... the rule that a federal court reviewing a decision by a state telecommunications regulatory agency is limited to review of the agency's order for compliance with federal law." *Global NAPs I,* 226 F.Supp.2d at 293; *id.* at 295 n. 21 (finding that district court would exceed its authority if it made "a declaration [ ] tantamount to a declaration of state contract law"); *id.* at 281 ("A district court's jurisdiction under § 252(e)(6) extends only to a determination of whether orders of a state utility commission like those at issue in this case comply with federal law.").

Magistrate Judge Alexander further explained:

In so finding, the Court is aware that there seems to be a trend among the federal circuit courts that takes a more expansive view of jurisdiction. In this vein, the appellate courts permit district courts to consider de novo whether carrier interconnection agreements are in compliance with the Act and the Act's implementing regulations, and to consider state law determinations pursuant to the arbitrary and capricious standard. *See, e.g., Brooks Fiber Communs. of Okla.,* 235 F.3d at 497–98, citing *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tex.,* 208 F.3d 475, 482 (5th Cir.2000); *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999); *US West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1117 (9th Cir. 1999). And although this Court recognizes the judicial efficiency and economy policy that drives the more expansive view of the Fourth, Fifth, Ninth and Tenth Circuits' decisions, the Court (and the parties) is bound by the First Circuit's contrary view as it was enunciated

---

4. A contrary decision might have the unintended consequence of upsetting the parties' bargain. The ICA in this case provides that Massachusetts law governs. *See* Rhode Island Agreement § 29.5 (R. at 101). Although a federal common law of contract might, as a general matter, permit parties to make and enforce contractual choice of law provisions, it might also refuse to give contractual choice of law provisions effect when there is a strong federal interest in uniform treatment of contracts across the nation.

in *P.R. Tel. Co.* To the extent the current cooperative jurisdictional framework creates a piecemeal approach to resolving the critical issues presented in litigation of the nature here, the remedy rests in the hands of legislature. *See Ill. Bell Tel. Co.*, 179 F.3d at 574.

*Id.* at 295 n. 21.

This court respectfully disagrees with the conclusion that *Puerto Rico Telephone Co. v. Telecommunications Regulatory Board,* 189 F.3d 1 (1st Cir.1999) controls this question. In that case, the First Circuit specifically limited its consideration to whether 47 U.S.C. § 252(e)(6) conferred subject matter jurisdiction. *Id.* at 9 & n. 4. This portion of the Telecommunications Act provides for United States district court review of the approval or denial of an interconnection agreement by a public utility commission such as the DTE. The First Circuit did not consider whether 28 U.S.C. § 1331 or any other statute provided for subject matter jurisdiction because the plaintiff did not assert as a basis for jurisdiction § 1331 or any statute other than § 252(e)(6) of the Act in its complaint. *Id.* at 9 n. 4. In this case, Global NAPs asserts jurisdiction under 28 U.S.C. §§ 1331, 1332(a) and 1367 as well as 47 U.S.C. § 252(e)(6). *See* Compl. ¶ 11.

In *Verizon Maryland, Inc. v. Public Service Commission,* 535 U.S. 635, 642, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), the Supreme Court explained that "even if § 252(e)(6) does not *confer* jurisdiction, it at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law." The court in *Global NAPs I* cited *Verizon Maryland* for the proposition that the Supreme Court "adhere[s] to the rule that a federal court reviewing a decision by a state telecommunications regulatory agency is limited to review of the agency's order for compliance with federal law." *Global NAPs I*, 226 F.Supp.2d at 293. This is not a correct interpretation of *Verizon Maryland.*

■ The Court in *Verizon Maryland* indicated that the Act does not generally remove from the federal courts their traditional and usual jurisdiction to hear a case arising from the decision of a state regulatory agency approving an interconnection agreement. A claim that the state agency's decision violated federal law arises under the laws of the United States and the court has jurisdiction under 28 U.S.C. § 1331. The court's traditional and usual jurisdiction includes supplemental jurisdiction under 28 U.S.C. § 1367 over claims that the state agency's decision was contrary to state law.[5]

In *Verizon Maryland,* the District Court held, after remand, that it had supplemental jurisdiction over state law claims that were part of the same dispute under 28 U.S.C. § 1367. *Verizon Md. Inc. v. RCN Telecom Svcs., Inc.,* 248 F.Supp.2d 468, 482–83 (D.Md.2003) (citing *City of Chicago*

---

5. The court notes that the DTE did not assert any Eleventh Amendment immunity it might have had from this court directing it on how to apply state law. *Compare City of Chicago*, 522 U.S. at 166–72, 118 S.Ct. 523 (holding that supplemental jurisdiction could be exercised over state claims for on-the-record review of administrative findings of local agency) *with id.* at 177 n. 3, 118 S.Ct. 523 (Ginsburg, J., dissenting) ("The Court's holding can embrace the decisions of state, as opposed to local, agencies, only if the State consents to the district court's jurisdiction [under] *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67[ ] (1984)."). *But see Verizon Delaware, Inc. v. AT & T Comms.,* 326 F.Supp.2d 574, 577–80 (D.Del.2004) (reaching conclusion that by participating in scheme established by the Act, state of Delaware had waived Eleventh Amendment immunity).

*v. Int'l Coll. of Surgeons*, 522 U.S. 156, 166–72, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997)). However, the district court abstained from hearing those claims. *Id.* at 487–88. The Fourth Circuit reversed this aspect of the District Court's decision and, in a split decision, held that the District Court had original jurisdiction under 28 U.S.C. § 1331 over the contract law claims at issue. *Verizon Md.*, 377 F.3d at 366,. For the reasons described earlier, this court is persuaded by, and adopts, the reasoning of the Maryland District Court and Judge Niemeyer in the *Verizon Maryland* proceedings that took place after remand by the Supreme Court.

As the court pointed out in *Global NAPs I*, 226 F.Supp.2d at 295 n. 21, consolidating all claims relating to the approval of an interconnection agreement in a single proceeding in federal court is more efficient and seems to be the trend among federal courts outside the First Circuit. Since *Puerto Rico Telephone* does not control this case in which jurisdiction under 28 U.S.C. §§ 1331 and 1367 is asserted and uncontested, this court finds that it has subject matter jurisdiction to decide all of Global NAPs' claims. This is the law— although not necessarily the reasoning—of

the Fourth, Fifth, Sixth, Ninth, Tenth and Eleventh Circuits. *See Global NAPs I*, 226 F.Supp.2d at 295 n. 21 (citing cases); *Verizon Md.*, 377 F.3d at 366; *Michigan Bell Tel. Co.*, 323 F.3d at 355–56 (6th Cir.2003); *BellSouth Telecommunications, Inc. v. MCImetro Access Transmission Svcs., Inc.*, 317 F.3d 1270, 1278–79 (11th Cir.2003).[6]

## B. STANDARD OF REVIEW

■ Global NAPs asserts that this court should exercise *de novo* review of all questions of law. Global NAPs' Br. at 9. Verizon agrees that *de novo* review is appropriate based on its belief that interconnection agreements are "federal regulatory documents" and their interpretation raises questions of federal law. Verizon's Br. at 15[7]. Verizon complains, however, that Global NAPs took the position in *Global NAPs I* that the interpretation of an interconnection agreement is a question of state law subject to review under an arbitrary and capricious standard and the court should not permit Global NAPs to "play fast and loose with" the various judges in this district. *Id.* at 15–16. Global NAPs responds that it "continues

---

6. The parties also did not address the question of whether the court should abstain from deciding Global NAPs' claims that are grounded in state law. A case requiring review of a state agency decision under state law is often the sort of natter in which a federal court should strongly consider abstention. *See generally Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). However, given the choice between adjudicating all of Global NAPs' claims or forcing the parties to litigate in this court to determine if the DTE's actions violated federal law, *see* 47 U.S.C. § 252(e)(4),(6), and, if the answer is no, then to litigate in the Massachusetts Supreme Judicial Court, *see* M.G.L. ch. 25, § 5, to determine if the DTE's actions violated state law, it appears most appropriate to resolve all of the disputes among the parties in a single proceeding.

Nevertheless, in the circumstances of this case, the court is not now addressing Global NAPs' contract misinterpretation claims. Having resolved the Full Faith and Credit Clause claim in Global NAPs' favor and decided to remand this case to the DTE, the court expects that the DTE will adopt different reasoning in deciding this case on remand even if it reaches the same result. Accordingly, it would not serve the interests of judicial economy to consider claims that may be mooted or altered by the DTE's actions after remand.

7. For the reasons describe earlier, Verizon's argument that an interconnection agreement is a "federal regulatory document" as opposed to a contract based on state law is incorrect.

to adhere to the position that interpretation of an interconnection agreement is a question of state law," but that "this case turns on a question of federal law," i.e., whether the FCC has "resolved the issue" within the meaning of Section 5.7.2.3. Global NAPs' Reply at 5. Thus, Global NAPs argues that this court should give no deference to the DTE's interpretation of federal law. *Id.* at 5.

Global NAPs' reasoning is incorrect. Although Section 5.7.2.3 links obligations under the contract to the outcome of certain federal proceedings and, therefore, incorporates federal legal issues, the ultimate question is whether the conditions specified by the state law contract have been met. This is a question of state law. *See Verizon Md.,* 377 F.3d at 393 (Niemeyer, J., dissenting) ("[T]hat private parties gratuitously incorporate federal law into an agreement does not change the fact that the terms are privately negotiated, and federal law exerts no independent force over the parties.") (citing *Mabe v. G.C. Svcs. Ltd.,* 32 F.3d 86, 88 n. 2 (4th Cir.1994); and *Oliver v. Trunkline Gas Co.,* 796 F.2d 86, 89–90 (5th Cir.1986)).

The DTE takes the position that the court should engage in *de novo* review "of purely legal determinations" of federal law and use the "arbitrary and capricious" standard for "all other issues" including "whether the Department correctly interpreted the disputed provision of the interconnection agreement, an issue informed by state contract law." DTE's Br. at 3. This contention is not completely correct.

The district court in *Verizon Maryland,* after remand, stated that "[i]n exercising its supplemental jurisdiction over Verizon's contract-misinterpretation claim, this Court would assume the posture of a Maryland circuit court, which would ordinarily entertain a suit challenging an order of the PSC. Review would be limited accord-

ingly." 248 F.Supp.2d at 487. This court agrees with this framework. If the Supreme Judicial Court were to review a decision of the DTE under M.G.L. ch. 25, § 5, it would uphold the DTE's "decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *MIT v. Dep't of Pub. Utils.,* 425 Mass. 856, 867–68, 684 N.E.2d 585 (1997); *MCI Worldcom Comm'ns, Inc. v. Dep't of Telecomm. & Energy,* 442 Mass. 103, 111–12, 810 N.E.2d 802 (2004). This court would apply this standard to issues governed by state law, while performing a *de novo* review of issues governed by federal law. *See Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.,* 339 F.3d 428, 433 (6th Cir.2003) ("Given the inherent logic of a federal appellate court reviewing *de novo* compliance with federal law and allowing state agencies wider deference in state law determinations, we also adopt the bifurcated standard employed by the majority of other circuits."). *But see Verizon Delaware,* 326 F.Supp.2d at 581–82.

Therefore, the parties would receive the same sort of deferential review of the DTE's decisions of state law by this court that they would have received before the Supreme Judicial Court. *See MCI Worldcom,* 442 Mass. at 112, 810 N.E.2d 802; *Children's Hosp. Corp. v. Rate Setting Comm'n,* 410 Mass. 66, 68–69, 570 N.E.2d 1019 (1991) (applying deferential review to agency interpretation of contract when statute conferred authority to approve contract to agency).

As described earlier, however, the court reaches the merits of only Global NAPs' Full Faith and Credit Clause claim and, therefore, has no occasion to apply any standard of review to the contract misin-

terpretation claims. Thus, the court has reviewed *de novo* the one issue being decided prior to remand.[8]

### C. FULL FAITH AND CREDIT CLAUSE

■ Global NAPs argues that the DTE's decision violates the Full Faith and Credit Clause because the question of whether Verizon continued to be liable to Global NAPs under Section 5.7.2.3 even after the FCC issued the Internet Traffic Order was resolved in Global NAPs' favor by the RIPUC. Global NAPs' Br. at 18–22. The court agrees that the Full Faith and Credit Clause applies to the RIPUC's decision, but finds that the RIPUC did not decide every issue that the DTE must decide. As there are still issues for the DTE to decide once it applies the correct framework, this case is being remanded.

■ Article IV, § 1 of the Constitution provides, in part, that "[f]ull faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state." This Clause is addressed to the states. Although the federal government is not bound to give similar credit by the Constitution, Congress has enacted a statute, 28 U.S.C. § 1738, requiring that the federal courts give full faith and credit to the "Acts, records and judicial proceedings" of the states. However, "as § 1738 is inapplicable to the judicially unreviewed findings of state administrative bodies," they are binding on the federal government not because of statute, but only because of common law principles favoring issue preclusion and claim preclu-

sion. *Astoria Fed. Savings & Loan Ass'n v. Solimino,* 501 U.S. 104, 109–10, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)

■ It is well established that "the Full Faith and Credit Clause compels the States to give preclusive effect to the fact-findings of an administrative tribunal in a sister State." *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 797–98, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *see also United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it on which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.").

The First Circuit has not addressed the question of whether preclusive effect must also be given to a state agency's conclusions of law. Verizon contends that only factual findings of state agencies are entitled to preclusive effect and that the RIPUC's determination that the FCC's Internet Traffic Order did not resolve the issue of how to treat ISP-bound traffic is a question of federal law. As discussed earlier, the RIPUC's interpretation and application of Section 5.7.2.3 involves issues of state law and not federal law. The RIPUC's determination that the issue of reciprocal compensation had not been resolved within the meaning of Section 5.7.2.3 involves both a question of state law, i.e., construing the terms of the agreement, and a question of fact, i.e., determin-

---

8. The question of issue preclusion may be a related matter of Rhode Island state law. *See Univ. of Tenn. v. Elliott,* 478 U.S. 788, 798–99, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (applying preclusion law of jurisdiction issuing preclusive decision). However, if so, the challenge to the DTE's decision not to adopt the RIPUC's interpretation and application of

Section 5.7.2.3 asserts an error of law. The Supreme Judicial Court would decide such a challenge *de novo. See Boston Police Superior Officers Fed'n v. Labor Relations Comm'n,* 410 Mass. 890, 892, 575 N.E.2d 1131 (1991) ("No such deference is appropriate, however, when the commission commits an error of law.").

ing whether the event terminating Verizon's interim obligation to pay reciprocal compensation has occurred.

In this case, the contract language is clear and does not really require interpretation. Thus, the issue of whether the ITO "resolved" the question at issue is, at least primarily, an issue of fact.

In any event, various circuits have adopted differing rules concerning the preclusive effect to be given to conclusions of law by a state agency acting in a judicial capacity. In *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 192–93 (3d Cir.1993), the Third Circuit held that a state administrative agency's determinations of issues of federal constitutional law would not be given preclusive effect. "[B]ased on the considerations listed in *Astoria* [*Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ]—the rights at stake, as well as the power and relative adequacy of state procedures in this highly specialized area," the Third Circuit concluded that parties should be able to litigate issues of federal constitutional law anew in the federal courts.

In *Miller v. County of Santa Cruz*, 39 F.3d 1030, 1037 & n. 7 (9th Cir.1994), the Ninth Circuit rejected the Third Circuit's reasoning in *Edmundson* and followed its earlier holdings that "we will give preclusive effect to the legal as well as the factual decisions of administrative tribunals, if the courts of the state would do so and if the minimum requirements of *Utah Construction*[ *U.S. v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)] are met."

For the reasons described below, this court finds that a state public utilities commission's conclusions of state law relating to an interconnection agreement are entitled to preclusive effect in subsequent proceedings before other states' public utili-

ties commissions to the same extent that they would receive preclusive effect in the first state's courts. Thus, to the extent that the RIPUC's decision involved the same questions of law presented to the DTE, the RIPUC's decision is entitled to preclusive effect.

Verizon argues that giving preclusive effect to the RIPUC's decision is inconsistent with the federal statutory scheme that grants the various states' public utility commissions the power to interpret and approve interconnection agreements. *See* Verizon's Supp. Br. at 5–7. This argument is not persuasive. The Supreme Court's decisions in *University of Tenn. v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) and *Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) are distinguishable. As they involved decisions to be made by the federal government, rather than a state, they were governed by the common law of issue preclusion rather than the Full Faith and Credit Clause. *See Elliott*, 478 U.S. at 799, 106 S.Ct. 3220 ("The Full Faith and Credit Clause is of course not binding on federal courts, but we can certainly look to the policies underlying the Clause in fashioning federal common-law rules of preclusion."); *Astoria*, 501 U.S. at 109–10, 111 S.Ct. 2166 (analyzing issue under framework of common law rather than 28 U.S.C. § 1738 or Full Faith and Credit Clause).

Moreover, unlike the statutory schemes at issue in *Elliott* and *Astoria*, there is nothing explicit or implicit in the text or structure of the Telecommunications Act that indicates that Congress intended to depart from the traditional rules of preclusion. In *Elliott*, the Court rested its decision on Title VII's directive that the Equal Employment Opportunity Commission give "substantial weight" rather than preclusive effect to the findings of state ad-

ministrative agencies. 478 U.S. at 795, 106 S.Ct. 3220. In *Astoria*, the Court identified two provisions of the Age Discrimination in Employment Act of 1967 that "plainly assume[d] the possibility of *federal* consideration after state agencies have finished theirs" and found a conflict between common-law rules of preclusion and the statute because "such federal proceedings would be strictly *pro forma* if state administrative findings were given preclusive effect." 501 U.S. at 111, 111 S.Ct. 2166 (emphasis added). There is no comparable provision in the Telecommunications Act indicating that Congress intended to alter the common law rules governing issue preclusion in a subsequent proceeding before a different state agency.[9]

Verizon also argues that Paragraph 32 of the Merger Order and the FCC's decision requiring Verizon to offer Section 5.7.2.3 to Global NAPs in Massachusetts establish that the DTE is not bound to follow the RIPUC's decision. However, neither the Merger Order nor the FCC's decision alter the impact of the Full Faith and Credit Clause. The fact that Paragraph 32 exempted Verizon from offering terms in Massachusetts contrary to Massachusetts regulatory policy has no bearing on Global NAPs' full faith and credit argument. The DTE claimed to have based its decision on contract law; it did not make a determination that Section 5.7.2.3 was contrary to Massachusetts' public policy. *See* S.R. at 12. Global NAPs' argument is that the DTE's contract law analysis is wrong because the contract law issue had already been decided by the RIPUC. As the RIPUC did not decide whether Section 5.7.2.3 conflicted with Massachusetts policy, the court is not deciding whether such a holding would be entitled to preclusive effect.[10]

Verizon's argument based on the FCC's Paragraph 32 decision is also without merit. The FCC correctly noted that the DTE would have to review and approve the Rhode Island Agreement before it could go into effect in Massachusetts. However, it did not give the DTE license

**9.** The court understands that the Eighth Circuit reached a contrary conclusion in *Iowa Network Services, Inc. v. Qwest Corp.*, 363 F.3d 683, 690 (8th Cir.2004). However, the holding of *Iowa Network Services* was a narrow one and the case is readily distinguishable. First, like *Elliott* and *Astoria*, *Iowa Network Services* addressed preclusion of a federal court under the common law rather than preclusion of another state under the Full Faith and Credit Clause. Second, the underlying issue was different. The Eighth Circuit wrote: "[o]ur review of the 1996 Act convinces us that Congress intended to supplant the common law principles of claim preclusion when it enacted the 1996 Act, at least with respect to the issues here involved." *Id.* The issue involved was a decision by the Iowa Utility Board ("IUB") that certain calls were subject to reciprocal compensation rather than to federal tariffs. "The IUB decision [] did not involve the approval, rejection, or even the interpretation of an interconnection agreement." *Id.* at 692. Rather, "the IUB was indisputably interpreting federal law."

*Id.* at 693. Mindful of the First Circuit's warning that "the subject [of collateral estoppel in the administrative context] is a complex one, with many variations, and it is perhaps well not to generalize too broadly," this court considers the differences between the IUB's decision in that case and the RIPUC's decision in this case to be so substantial that *Iowa Network Services* has little or no persuasive value in the context of this case. *Bath Iron Works Corp. v. Dir., OWCP*, 125 F.3d 18, 21 (1st Cir.1997).

**10.** It would be an extremely rare case in which a state commission would properly have before it the question of whether an ICA violated another state's public policy, and the resolution of that question would be necessary to the decision reached by the commission. Therefore, enforcing the Full Faith and Credit Clause in this context does not entail a serious risk that one state will be able to improperly force its public policy views on another state.

to ignore its obligations under the Full Faith and Credit Clause when performing its evaluation. There is a difference between acknowledging that the DTE has authority to interpret a contract and deciding what rules the DTE must follow in carrying out its responsibilities. The FCC did the former, not the latter. The DTE's obligation to give the RIPUC's decision preclusive effect does not arise from, nor is it limited by, the Merger Order or the FCC's decision applying the Merger Order to the dispute between Global NAPs and Verizon. Rather, it arises from Article IV of the Constitution, and the body of common law interpreting and applying the Full Faith and Credit Clause.[11]

Similarly, the FCC's conclusion that Global NAPs' claim for damages was premature is not inconsistent with this court's conclusion that the DTE is bound by the RIPUC's decision. The RIPUC's decision goes to the meaning of Section 5.7.2.3 and its implications. Regardless of whether the DTE was required to adopt the RIPUC's interpretation and application of Section 5.7.2.3, the DTE would still have been entitled to reject the agreement as contrary to Massachusetts public policy. Thus, unless and until the DTE approved the agreement in Massachusetts, Global NAPs' damages claims were premature, as the FCC found.

Finally, Verizon cites as support for its position the plurality opinion in *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 100 S.Ct. 2647, 65 L.Ed.2d 757 (1980)[12]. In *Thomas,* the Court grappled with the question of whether an award of disability benefits under the Virginia Workmen's Compensation Act by a Virginia agency barred a supplemental award under the District of Columbia's Workmen's Compensation Act. The four-Justice plurality first analyzed two earlier cases dealing with this subject, *Magnolia Petroleum Co. v. Hunt,* 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 149 (1943) and *Industrial Commission of Wisconsin v. McCartin,* 330 U.S. 622, 67 S.Ct. 886, 91 L.Ed. 1140 (1947). In *Magnolia,* the Court held that an injured worker could not obtain a supplemental award under the Louisiana Workmen's Compensation Act after obtaining a recovery from a Texas agency applying the Texas Workmen's Compensation Act. *Thomas,* 448 U.S. at 267–68, 100 S.Ct. 2647. In *McCartin,* the Court severely limited the application of *Magnolia,* holding that a state workmen's compensation statute must contain unmistakable lan-

---

**11.** Although the court does not rely on paragraph 32 of the Merger Order in deciding Global NAPs' full faith and credit claim, it appears that enforcing issue preclusion in this case is consistent with the intent and purpose of paragraph 32 of the Merger Order. As a condition of the merger creating Verizon from Bell Atlantic and GTE, Verizon agreed that it would permit any company to adopt any interconnection agreement currently in force in the Bell Atlantic region anywhere else in the region. The Rhode Island Agreement was one such agreement. Verizon knew how it was being interpreted and applied in Rhode Island before the merger closed and indeed before Verizon even proposed the voluntary conditions of the merger to the FCC. Verizon proposed and agreed to Paragraph 32 of the Merger Order with knowledge of the possibili-

ty that CLECs would find the ICA that was least favorable to Verizon and most favorable to the CLECs, and use Paragraph 32 to force Verizon to adopt that comparatively unfavorable agreement all over the Bell Atlantic region. Permitting Verizon to get a more favorable version of the Rhode Island Agreement in Massachusetts after the merger than it had in Rhode Island before the merger would undermine the purpose of Paragraph 32.

**12.** Justice Stevens wrote a plurality opinion in which three other justices joined. Justice White wrote an opinion concurring in the judgment in which Chief Justice Burger and Justice Powell joined. Justice Rehnquist wrote a dissenting opinion in which Justice Marshall joined.

guage that the legislature intends to preclude remedies in proceedings brought in other states for an award of benefits to preclude a supplemental award by another state. *Thomas*, 448 U.S. at 268–69, 100 S.Ct. 2647. Finding the reasoning of *McCartin* unpersuasive and the application of *Magnolia* so limited that principles of *stare decisis* would not be offended by "a fresh examination of the full faith and credit issue," the plurality addressed the Full Faith and Credit Clause issue unconstrained by precedent. *Id.* at 270–77, 100 S.Ct. 2647.

The plurality reasoned that although the first state to issue an award of disability benefits has a strong interest in seeing that those benefits are paid, the state's interest in capping the liability of employers is not strong enough to justify "an unnecessarily aggressive application of the Full Faith and Credit Clause." *Id.* at 282–86, 100 S.Ct. 2647; *see also id.* at 280, 100 S.Ct. 2647 ("The ultimate issue, therefore, is whether Virginia's interest in the integrity of its tribunal's determinations forecloses a second proceeding to obtain a supplemental award in the District of Columbia."). Based on this balancing of interests, the plurality concluded that "[s]ince [the Virginia agency] was not requested, and had no authority, to pass on petitioner's rights under District of Columbia law, there can be no constitutional objection to a fresh adjudication of those rights." *Id.* at 262–63, 100 S.Ct. 2647.

The three justices concurring in the judgment stated they were "unable to join in the reasoning by which the plurality reaches th[e] result [because] [a]lthough the plurality argues strenuously that the rule of today's decision is limited to awards by state workmen's compensation boards, it seems ... that the underlying rationale goes much further." *Id.* at 286, 100 S.Ct. 2647 (White, J., concurring in the judgment). Noting that "[o]ne purpose of the Full Faith and Credit Clause is to bring an end to litigation" and that "[t]he plurality's opinion is at odds with this principle of finality", Justice White explained that he would reach the same judgment based on the more narrow holding of *McCartin* despite the questionable foundations of that decision. *Id.* at 288–89, 100 S.Ct. 2647. Justices Rehnquist and Marshall dissented, "fear[ing] that the rule proposed by the plurality is both ill-considered and ill-defined" and "badly distort[s] an important constitutional tenet." *Id.* at 290, 295, 100 S.Ct. 2647 (Rehnquist, J., dissenting).

This court finds that the splintered opinions in *Thomas* do not establish a general rule against the application of the Full Faith and Credit Clause in every case where the second tribunal is applying a different body of law. Rather, the *Thomas* decision is, as the plurality "argue[d] strenuously," binding precedent only in the limited context of workmen's compensation awards. *Id.* at 286, 100 S.Ct. 2647 (White, J., concurring in the judgment). The balancing test articulated by the plurality has never been adopted by a majority of the Supreme Court[13] or by the First Circuit.

**13.** Verizon argues that "[a] majority of the Supreme Court recently reaffirmed [*Thomas '*] limitation on the applicability of the Full Faith and Credit Clause, holding that while '[r]ecognition, under full faith and credit is owed to dispositions Michigan has authority to order,' 'a Michigan decree cannot command obedience elsewhere on a matter the Michigan court lacks authority to resolve." Verizon's Supp. Br. at 3 n. 3 (quoting *Baker* *ex rel. Thomas v. General Motors Corp.*, 522 U.S. 222, 240–41, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998)). *Baker* is inapposite. In *Baker*, General Motors argued that a permanent injunction entered by a Michigan court as part of a settlement agreement barring a former GM employee from testifying in litigation involving GM must be given full faith and credit so as to defeat a subpoena of the employee by a Missouri court in a case between GM and

In summary, the DTE may not refuse to give the RIPUC's decision any less preclusive effect than a Rhode Island court would. The fact that under the Act, telecommunications companies litigate contractual disputes concerning interconnection agreements before specialized public utilities commissions rather than in state courts of general jurisdiction does not alter the fundamental calculus that the goals of conserving judicial resources, promoting finality, and enforcing repose served by *res judicata* outweigh the goal of making sure that a decision is correct by relitigating it over and over again. Moreover, unlike the determinations of federal constitutional law at issue in *Edmundson*, the RIPUC's resolution of state law contract issues relating to interconnection agreements are issues that are within the area of expertise of state utility commissions and the federal interests at stake are significantly lower. Therefore, preclusion is appropriate, even in subsequent proceedings before a different state's commission. *Cf. Astoria*, 501 U.S. at 109–10, 111 S.Ct. 2166 ("Although administrative estoppel is favored as a matter of general policy, its suitability may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures."); *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 135 (3d Cir.1998) (determining "that the factual findings and legal conclusions of the NYPSC should be given preclusive effect to the extent afforded under New York law" because Public Utility Regulatory Policies Act did not contain a provision "that seeks to limit common

law rules of preclusion from applying to state agency decisions relating to utility regulation").

Thus, this court holds that all of the decisions of the RIPUC-both factual and legal—are entitled to the same preclusive effect before other agencies and courts that they would receive in the Rhode Island state courts. *Cf. Elliott*, 478 U.S. at 798–99, 106 S.Ct. 3220 (holding that "federal courts must give the [state] agency's factfinding the same preclusive effect to which it would be entitled in the State's courts").

### D. ISSUE PRECLUSION APPLIED TO THIS CASE

The Rhode Island Supreme Court has described the elements of collateral estoppel as follows:

> The doctrine of collateral estoppel makes conclusive in a later action on a different claim the determination of issues that were actually litigated in a prior action. As the United States Supreme Court has explained, collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." As we have stated, the requirements are (1) that there be an identity of issues, (2) that the prior proceeding resulted in a final judgment on the merits, and (3) that the party against whom collateral estoppel is asserted be the same as or in privity with a party in the prior proceeding. We have subdivided the first requirement, identity of

---

third-parties who were not involved in the Michigan case. Although the Court quoted *Thomas* in summarizing its ruling in *Baker*, the holding of *Baker* "simply recogniz[ed] that, just as the mechanisms for enforcing a judgment do not travel with the judgment itself for purposes of full faith and credit, and

just as one State's judgment cannot automatically transfer title to land in another State, similarly the Michigan decree cannot determine evidentiary issues in a lawsuit brought by parties who were not subject to the jurisdiction of the Michigan court." *Id.* at 239, 118 S.Ct. 657 (citations omitted).

issues, into three factors: (1) the issue sought to be precluded must be identical to the issue determined in the earlier proceeding, (2) the issue must actually have been litigated in the prior proceeding, and (3) the issue must necessarily have been decided.

*E.W. Audet & Sons, Inc. v. Fireman's Fund Ins. Co.*, 635 A.2d 1181, 1186 (R.I. 1994) (citations omitted). Here, the RIPUC decided an "ultimate fact" by determining that the ITO did not resolve the question of whether Verizon was required to pay Global NAPs reciprocal compensation and ordering Verizon to continue making payments until the issue was resolved.

■ Verizon and the DTE do not claim that the RIPUC was not acting in a judicial capacity, that the RIPUC exceeded its authority, that Verizon lacked an adequate opportunity to litigate before the RIPUC and appeal its decision, that the RIPUC's decision was not a final judgment on the merits or that there is a lack of privity. Verizon's only contention that bears directly on the preclusive effect of the RIPUC's decision is the argument that the issue decided by the RIPUC was not the same issue presented to the DTE because, although the agreements contain the same text, they are really separate agreements that are to be construed under distinct bodies of state law.

A rule limiting the collateral estoppel effect of judgments to only those subsequent proceedings governed by the same state's law as the original proceeding would improperly elevate form over substance. There is no good reason to refuse to apply issue preclusion to identical language in identical contracts in a case such as this one where Verizon can point to no substantive difference between Rhode Island contract law and Massachusetts contract law. *See Raytech Corp. v. White*, 54 F.3d 187, 191 (3d Cir.1995) ("To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be 'substantial.' "); *Bath Iron Works Corp. v. Dir., OWCP*, 125 F.3d 18, 21 (1st Cir.1997) ("Certainly a difference in the legal standards pertaining to two proceedings may defeat the use of collateral estoppel. But this is so only where the difference undermines the rationale of the doctrine.") (citations omitted); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4417, at 449–64 ("[O]f course the laws of different states may give different meanings to the same legal terms [but] careful examination of the controlling legal principles may show that the standards are the same, or that the fact findings have the same effect under either standard, so that the same issue is presented by both systems of law."). Rather, this case fits the paradigm described in 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4467, at 48: "Identical issues [for which preclusion is appropriate] could easily be presented, for example, by actions under identically worded but separate contracts between the same parties."

All of the parties agree that the contract language at issue is unambiguous. *See* Global NAPs' Reply at 6 (referring to "plain language of the Rhode Island Agreement"); Verizon's Br. at 16 (referring to "plain language of the agreement"); DTE's Br. at 4 (referring to "plain language of the Rhode Island Interconnection Agreement"). Under both Rhode Island and Massachusetts law, the agencies and courts "must give effect to the plain language of the Agreement and give terms their usual and ordinary meaning." DTE's Order on Petition for Reconsideration at 11 n. 10 (citing *116 Commonwealth Condominium Trust v. Aetna Casualty &*

*Surety Co.*, 433 Mass. 373, 376, 742 N.E.2d 76 (2001) (S.R. at 12)); *accord Spratt v. Forbes*, 705 A.2d 991, 992 (R.I.1997) ("It is well settled that ... words in the contract must be given their plain and ordinary and usual meaning."). Therefore, the difference in the controlling law, if there is one at all, is not substantial.

Verizon also argues that the District of Columbia Circuit's decision in *Starpower Communications, LLC v. FCC*, 334 F.3d 1150 (D.C.Cir.2003) "illustrates that state commission interpretations of 1996 Act interconnection agreements do not have preclusive effect on other tribunals." Verizon's Supp. Br. at 6. Verizon describes the *Starpower* decision as follows:

> In *Starpower*, the D.C. Circuit reviewed the FCC's determination that an agreement between Verizon Virginia and Starpower unambiguously did not require the payment of reciprocal compensation for traffic delivered to Internet service providers ("ISPs"). However, in an earlier decision issued in 1997, the Virginia commission had "constru[ed] the identical agreement[] [and] held that it required reciprocal compensation for ISP-bound traffic." *Id.* at 1156. Before the FCC and the D.C. Circuit, Starpower argued that the earlier decision was "dispositive, because, as to Verizon Virginia, it is preclusive under the doctrine of collateral estoppel." *Starpower Order* ¶ 40 (R.271–72); *see* Brief for Petitioner Starpower Communications, LLC, *Starpower Communications, LLC v. FCC*, No. 02–1131, at 35–39 (D.C.Cir. filed Mar. 20, 2003) (Attach.1). Both the FCC and the D.C. Circuit rejected that claim, with the D.C. Circuit holding, contrary to the earlier Virginia decision,

that the language in the Starpower Agreement (which is different from the language at issue here) was ambiguous. *See Starpower*, 334 F.3d at 1156; *see also Starpower Order* ¶ 40 (R.271–72).

*Id.* at 6–7 (brackets in original).

The court agrees with Verizon to the extent that it appears that the FCC and the D.C. Circuit did not find that collateral estoppel operated in that case in the manner that Global NAPs advocates in this case. However, the D.C. Circuit did not discuss the issue at all in its decision [14]. Instead, the D.C. Circuit wrote: "The Commission determined that certain state regulatory decisions, ... including a decision of the VSCC, *Petition of Cox Virginia Telecom, Inc.*, Case No. PUC970069, Final Order (1997), all holding that similar interconnection agreements required reciprocal compensation for ISP-bound traffic, were not dispositive because 'none of these decisions specifically construes the contractual language at issue in this case.'" *Starpower*, 334 F.3d at 1154 (quoting *Starpower Order* ¶ 39).

It appears that the D.C. Circuit may have misunderstood the FCC's Order in this respect. More specifically, the D.C. Circuit may have been focusing only on paragraph 39 of the *Starpower Order*. However, the FCC addressed the *Cox* petition in paragraph 40 of the *Starpower Order* rather than paragraph 39. In paragraph 39, the FCC distinguished "the many state regulatory commission decisions cited by Starpower" that did not "specifically construe[] the contractual language at issue in this case." The FCC then went on to address the *Cox* petition separately in paragraph 40, writing:

---

**14.** The D.C. Circuit held that the contractual language was ambiguous and remanded the case to the FCC. Before the FCC issued a decision after remand, the parties "resolved the dispute to their mutual satisfaction" and jointly secured a dismissal of the complaint. 18 F.C.C.R. 24,849 ¶¶ 3–5 (Nov. 25, 2003).

One decision merits additional discussion. Starpower contends that the Virginia SCC's decision in Cox Virginia Telcom is dispositive, because, as to Verizon Virginia, it is preclusive under the doctrine of collateral estoppel, and because it is a binding determination by a state commission that, pursuant to the Order on Remand, the Commission cannot preempt. We disagree. First, Starpower has not demonstrated that the requirements for collateral estoppel have been satisfied. *Under Virginia law, in order for collateral estoppel to apply, the "factual issue sought to be litigated actually must have been litigated in the prior action." The meaning of the agreements between Starpower and Verizon Virginia was not at issue in Cox Virginia Telcom.* Accordingly, Starpower cannot avail itself of the collateral estoppel doctrine in this proceeding. In any event, at Starpower's request, this Commission already has preempted the Virginia SCC's authority to interpret the "interconnection agreements between Starpower and GTE and Bell Atlantic." The Virginia SCC has not yet addressed the dispute between the parties to these agreements, and we believe the case is appropriate for our resolution.
*Starpower Order* ¶ 40 (footnotes omitted) (emphasis added).

Thus, the D.C. Circuit in *Starpower* did not directly or persuasively address the preclusive effect of a final order of a state utility commission against a party construing language in an interconnection agreement that is identical to language of an interconnection agreement that was fully litigated in an earlier case, and is at issue in a subsequent case involving that same party. The instant case is also distinguishable from the situation as described by the FCC in *Starpower* because here the court has found that the threshold issue before the DTE is identical to the issue that was

fully litigated and decided in the earlier RIPUC proceeding. However, to the extent, if any, that the FCC, standing in the shoes of the Virginia State Corporation Commission, and this court disagree over whether the fact that two agreements are legally distinct is sufficient to prevent application of issue preclusion even when the two agreements contain the same unambiguous provisions, this court is not required to give the FCC any deference on this question. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority."). Neither the FCC nor the state agency it preempted have particular expertise with respect to the law of collateral estoppel.

Finally, Verizon argues that there can be no issue preclusion in this case because the RIPUC's decision was "based on its interpretation of *federal law,* which it found the parties had incorporated into their agreement." Verizon's Supp. Br. at 8. Verizon argues that a state agency's "interpretation of federal law does *not* bind an agency in another state." *Id.* at 9. This argument is incorrect because, as discussed earlier, the fact that Section 5.7.2.3 refers to and incorporates federal law does not alter its status as a term in a state law contract that is interpreted according to state law.

To the extent that Rhode Island and Massachusetts law concerning contract interpretation are the same, the DTE was, and remains, required to adopt the decision that the RIPUC made on an identical question. However, not every relevant question before the DTE was decided by the RIPUC. When the parties negotiated the Rhode Island Agreement, they apparently assumed that the FCC would clearly resolve the status of ISP-bound traffic one

way or the other. Instead, the FCC's decision left open the possibility that even though federal law did not mandate that ISP-bound traffic be subject to reciprocal compensation, state law might require reciprocal compensation.

In light of this possibility, and the fact that neither the RIPUC nor any other body had yet addressed the state law issue in Rhode Island, the RIPUC ruled that the FCC's February 26, 1999 Internet Traffic Order did not resolve the issue of whether reciprocal compensation was due within the meaning of Section 5.7.2.3. As the parties were found to have a good faith dispute over this question under Rhode Island law, the RIPUC ruled that pending the resolution of that dispute by the RI-PUC, the issue was not resolved and Verizon was required to continue making payments to Global NAPs under Section 5.7.2.3.

Verizon is bound by the RIPUC's determination that the Internet Traffic Order did not by itself end Verizon's obligation to make interim payments under Section 5.7.2.3. It cannot relitigate that issue before the DTE. However, Verizon is not bound by the RIPUC's determination that the issue was not resolved because the parties had a good faith dispute over whether reciprocal compensation was owed under the Act. Under the Internet Traffic Order, state legal or equitable principles, including but not limited to contract law principles, provided the only possible source for any duty Verizon had to pay Global NAPs reciprocal compensation. It

is possible that, in view of the state of the law in Rhode Island in 1999, the issue was not resolved, but, in view of the state of the law in Massachusetts at a later time, the issue was resolved. Since the RIPUC did not decide the precise issue that the DTE must now decide, Verizon is not precluded from litigating that issue before the DTE.[15]

Verizon and the DTE might argue that a remand is not necessary because the DTE has already addressed this issue. In this case, the DTE examined its prior decisions and determined that it had already decided whether ISP-bound traffic should be treated as local traffic in Massachusetts in its May 1999 Order. At no point in its decision did the DTE claim that the Internet Traffic Order resolved the issue nationwide. Instead, it wrote that the ITO resolved the issue *in Massachusetts.* See R. at 369 ("Moreover, we do not agree that the issue of reciprocal compensation for ISP-bound traffic is in an 'undeterminable' or unresolved status in Massachusetts."); R. at 370 ("[T]hat issue was resolved in Massachusetts with the issuance of the FCC's *Internet Traffic Order* in February 1999.").

However, Judge Lindsay ruled in *Global NAPs I* that the DTE failed to consider state legal and equitable principles adequately in issuing its May 1999 Order and other Orders. *See Global NAPs I,* 226 F.Supp.2d at 288–89, 294–95. In other words, at the time the DTE made its decision in this case, it had not properly addressed the state legal and equitable

---

**15.** The parties have not focused on the implications of the RIPUC's analysis regarding the presence of a good faith complaint regarding state law as sufficient (put perhaps not necessary) to create a rebuttable presumption that the issue was not resolved within the meaning of Section 5.7.2.3. "Burdens of proof, sufficiency of evidence ... and presumptions are sometimes treated as substantive and some-

times as procedural." 1 John Henry Wigmore, *Wigmore on Evidence* § 5, at 358 n. 11 (Peter Tillers ed., 1983). On remand Verizon and Global NAPs may present to the DTE, in the first instance, any contentions regarding additional issues that one or both of them are estopped from relitigating in view of the RI-PUC's decisions.

principles that might have made the issue of reciprocal compensation unresolved in Massachusetts within the meaning of Section 5.7.2.3.

After the remand in *Global NAPs I*, the DTE issued a new decision, rejecting various CLECs' arguments that reciprocal compensation was due under state legal or equitable principles. D.T.E. Order No. 97–116–G. This Order was affirmed by the Supreme Judicial Court in *MCI Worldcom Communications, Inc. v. DTE*, 442 Mass. 103, 810 N.E.2d 802 (2004). Nevertheless, this Order cannot revive the DTE's decision in this case. On remand, the DTE must decide not whether state legal or equitable principles entitle Global NAPs to reciprocal compensation in the future, but rather at what point those principles were so clear that the issue was resolved within the meaning of Section 5.7.2.3 such that Verizon's obligation to make interim payments was terminated.

## IV. THE PROCEEDINGS ON REMAND

Thus, it is possible that on remand, the DTE will determine that regardless of whether or when the issue was resolved in Rhode Island within the meaning of the parties' agreement, it was resolved in Massachusetts at some point earlier than July 14, 2001 [16]. If the DTE determines that the issue was resolved on or before July 24, 2000, it will have reached the same conclusion regarding the import of Section 5.7.2.3 that it reached in June 2002.

If, however, the DTE determines that the issue was not resolved until after July 24, 2000, Verizon is obligated under Section 5.7.2.3 to pay reciprocal compensation for calls terminated in Massachusetts during the period from July 24, 2000 until the date that the issue was resolved. If the DTE decides that Section 5.7.2.3 requires the payment of reciprocal compensation for at least part of the relevant period, it may then have to address Verizon's argument that the agreement "is not consistent with the public interest, convenience, and necessity." 47 U.S.C. § 252(e)(2)(A).

## V. ORDER

Accordingly, it is hereby ORDERED that:

1. Global NAPs, Inc.'s Motion for Summary Judgment (Docket No. 11) is ALLOWED in part.

2. Verizon New England Inc's Cross–Motion for Summary Judgment (Docket No. 17) is DENIED.

3. The Massachusetts Department of Telecommunications and Energy's Cross–Motion for Summary Judgment (Docket No. 20) is DENIED.

4. This case is REMANDED to the Massachusetts Department of Telecommunications and Energy for further proceedings consistent with this Memorandum.

---

**16.** Verizon persuasively argues, and Global NAPs agrees, that if the court finds that the RIPUC's 1999 Order finding that the ITO did not resolve the issue precludes Verizon from relitigating that issue, the RIPUC's 2002 Order finding that the Order on Remand did resolve the issue should preclude Global NAPs from asserting any right to interim compensation after June 14, 2001. *See* March 9, 2004 Tr. at 24, 46.